[No. A026415. First Dist., Div. Four. Dec. 23, 1985.]

NORMAN GOODWIN et al., Plaintiffs and Appellants, v.
LAWRENCE A. REILLEY, Defendant and Respondent.

---

COUNSEL

Raymond S. Kraft and Mark S. Pollock for Plaintiffs and Appellants.

William R. Morton for Defendant and Respondent.

---

OPINION

**SABRAW, J.**—Plaintiffs Norman Goodwin and Joann Goodwin sued defendant Lawrence M. Reilley for the negligent infliction of emotional distress resulting from injuries suffered by their son and caused by defendant's driving while intoxicated. Defendant's demurrer to the first amended complaint was sustained without leave to amend and the action was dismissed. Plaintiffs appeal. The question presented is whether a tortfeasor who injures a third party as the result of driving under the influence of alcohol is liable to the third party's parents for their emotional distress when the parents were not percipient witnesses to the accident.

 The facts as set forth in the first amended complaint[1] and plaintiffs' accompanying declaration show that on May 30, 1983, plaintiffs' son Dwight was struck and seriously injured when defendant's motorcycle crossed the center line and collided with Dwight's motorcycle. At 8 the next morning, May 31, 1983, plaintiffs received a telephone call from the St. Helena Hospital informing them of Dwight's accident and that he had suffered a broken leg and broken arm. Plaintiffs drove from their home in San Diego to Watsonville, where they spent the night with their daughter and her family. Plaintiffs' daughter had visited Dwight at the hospital and she informed her parents of the extent of his injuries.

---

[1]In testing the sufficiency of a complaint against a demurrer, the rule is that a demurrer admits " 'all material and issuable facts properly pleaded.' " (*Delta Farms Reclamation Dist. v. Superior Court* (1983) 33 Cal.3d 699, 702 [190 Cal.Rptr. 494, 660 P.2d 1168]; accord, *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 162, fn. 2 [216 Cal.Rptr. 661, 703 P.2d 1].)

The next morning, June 1, plaintiffs visited Dwight at the St. Helena Hospital. They found him heavily sedated, his eyes "red with hematomas," his nose bandaged, with a drainage tube inserted, and a breathing tube in his throat. Dwight's spleen had been removed because of hemorrhaging and he suffered fourteen fractures of his bones. Four surgeries were scheduled. Plaintiffs "were put in fear of his imminent death." In an attempt to save his life, plaintiffs were required to give their consent to certain surgical procedures, including the amputation of his left leg. Dwight's leg was amputated on June 15, 1983. On September 1, 1983, defendant was convicted of operating a motor vehicle under the influence of alcohol in violation of Vehicle Code section 23153, subdivisions (a) and (b).[2]

Plaintiffs' complaint for negligent infliction of emotional distress sought to recover damages for their emotional distress upon observing Dwight's injuries and his pain and suffering. In three counts they alleged theories of liability based on (1) negligence in driving under the influence of alcohol and crossing the centerline; (2) negligent failure to carry adequate insurance coverage to compensate their son for his injuries; and (3) strict liability resulting from the ultrahazardous activity of driving under the influence of alcohol in violation of sections 23152 and 23153.

On appeal plaintiffs challenge the trial court's order and judgment of dismissal with respect only to counts 1 and 3.

DISCUSSION

1. *Ultrahazardous Activity*

Relying on *SKF Farms* v. *Superior Court* (1984) 153 Cal.App.3d 902 [200 Cal.Rptr. 497], plaintiffs contend that the court erred in sustaining the demurrer to the third cause of action, strict liability for ultrahazardous activity, because the issue of whether an activity is ultrahazardous is one of fact, not law, and cannot be decided on demurrer. Implicit in this argument is the premise that if drunk driving were determined to be an ultrahazardous activity, defendant's liability would thereby extend to damages for the emotional distress suffered by plaintiffs upon learning of their son's serious injury. In this premise plaintiffs mistake the nature of the tort doctrine of strict liability for ultrahazardous activities.

"Strict liability" is liability without fault. (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 75, pp. 534-538; see *Luthringer* v. *Moore* (1948) 31 Cal.2d 489, 492 [190 P.2d 1].) Section 519, Restatement

---

[2]All further statutory references are to the Vehicle Code unless otherwise indicated.

Second of Torts, sets forth the general principle as follows: "(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm. [¶] (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." (Rest.2d Torts, § 519, p. 34.)

 The tort concept of an abnormally dangerous or ultrahazardous activity presupposes that the activity has some social value and that reasonable care is insufficient to eliminate its risk of harm.[3] The principle that those who engage in such an activity should be held strictly liable for the consequences reflects a social-policy determination that "the defendant's enterprise, while it will be tolerated by the law, must pay its way. . . . [¶] This . . . policy frequently has found expression where the defendant's activity is unusual and abnormal in the community, and the danger which it threatens to others is unduly great—and particularly where the danger will be great even though the enterprise is conducted with every possible precaution. The basis of the liability is the defendant's intentional behavior in exposing those in his vicinity to such a risk. The [defendant's] conduct . . . occupies something of a middle ground. It is conduct which does not so far depart from social standards as to fall within the traditional boundaries of negligence—usually because the advantages which it offers to the defendant and to the community outweigh even the abnormal risk; but which is still so far socially unreasonable that the defendant is not allowed to carry it on without making good any actual harm which it does to his neighbors." (Prosser & Keeton, *op. cit. supra*, § 75 at pp. 536-537; see Rest. 2d Torts, § 519, com. d., pp. 34-35.)

Familiar examples of abnormally dangerous activities giving rise to strict liability include the keeping of animals likely to trespass or animals having known dangerous propensities (Prosser & Keeton, *op. cit. supra*, at § 76, pp. 538-543), and dangerous "non-natural" and uncommon uses of land, such as the storage of explosives, blasting, and crop dusting (*id.*, at § 78, pp. 545-551; see *Luthringer* v. *Moore, supra,* 31 Cal.2d 489 [fumigation]; *SKF Farms* v. *Superior Court, supra,* 153 Cal.App.3d 902 [crop dusting]).

 Because liability for an ultrahazardous activity is imposed irrespective of the defendant's reasonable care and regardless of fault, an individual

---

[3]Restatement Second of Torts states as follows: "In determining whether an activity is abnormally dangerous, the following factors are to be considered: [¶] (a) existence of a high degree of risk of some harm to the person, land or chattels of others; [¶] (b) likelihood that the harm that results from it will be great; [¶] (c) inability to eliminate the risk by the exercise of reasonable care; [¶] (d) extent to which the activity is not a matter of common usage; [¶] (e) inappropriateness of the activity to the place where it is carried on; and [¶] (f) extent to which its value to the community is outweighed by its dangerous attributes." (Rest.2d Torts, § 520, p. 36.)

who engages in such activity is subject to a narrower, rather than a greater, liability than otherwise obtains. As stated in the Restatement Second of Torts: "The rule of strict liability [for abnormally dangerous activities] applies only to harm that is within the scope of the abnormal risk that is the basis of the liability. One who carries on an abnormally dangerous activity is not under strict liability for every possible harm that may result from carrying it on." (Rest.2d Torts, § 519, com. e., p. 35.) Rather, the strict liability that results from this "special responsibility" (Prosser & Keeton, *op. cit. supra,* § 79, p. 560)—responsibility without fault—has been confined to consequences which lie within the extraordinary risk posed by the abnormally dangerous activity (*ibid.*) and is limited to the "class of persons who are threatened by the abnormal danger, and the kind of damage they may be expected to incur. . . ." (*Id.,* at p. 562.)

■ As Prosser and Keeton explain: "The same practical necessity for the restriction of liability within some reasonable bounds, which arises in connection with problems of 'proximate cause' in negligence cases, demands here that some limit be set. It might be expected that this limit would be a narrower one where no initial departure from a social standard is to be found. In general, this has been true. Just as liability for negligence has tended to be restricted within narrower boundaries than when intentional misconduct is involved, there is a visible tendency to restrict it still further when there is not even negligence. . . . [W]here there is neither intentional harm nor negligence, the line is generally drawn at the limits of the risk, or even within it." (Prosser & Keeton, *op. cit. supra,* § 79, at p. 560, fns. omitted.)

Pursuant to the foregoing principles, we conclude that the act of driving a motor vehicle under the influence of alcohol, although unquestionably dangerous and hazardous-in-fact, does not come within the rubric of an ultrahazardous or abnormally dangerous activity for purposes of tort liability, and that to hold defendant strictly liable for the consequences of his driving would not, in any event, extend his liability beyond that imposed for negligence.

We turn, therefore, to a consideration of plaintiffs' first cause of action, negligence per se.

## 2. *Negligence Per Se*

■ The gravamen of plaintiffs' theories below and their argument on appeal is that driving under the influence of alcohol is an especially socially reprehensible activity, as the Legislature has recognized by the enactment of sections 23152 and 23153, and that an individual who engages in such conduct in violation of statute should be held liable for all the proximate

and foreseeable consequences, including the predictable severe emotional distress suffered by his primary victim's parents when they view the injuries and pain and suffering resulting to their son from the defendant's conduct.

■ We start with the principle that the touchstone of tort liability is foreseeability. "Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis." (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 740 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]; accord *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159, 166.)

■ In *Dillon, supra,* our Supreme Court for the first time recognized the tort of negligent infliction of emotional distress. The court held that a mother, who witnessed her young child struck and killed by an automobile driven by the defendant, could bring an action for the physical injuries she suffered from the fright and shock of the event. Although the mother was not herself in the "zone of danger," the late Justice Tobriner, writing for a majority of the court, found that the legal requirements of "duty" and "foreseeability" were met by the facts alleged. However, in order to limit the otherwise "potentially infinite liability" which would follow every negligent act (68 Cal.2d at p. 739), the court announced the following guidelines to aid in ascertaining whether a third-party or "bystander" cause of action was stated in a particular case: "(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (68 Cal.2d at pp. 740-741.)

Plaintiffs do not claim to have stated a *Dillon* bystander cause of action, nor could they do so, in light of the undisputed fact that they were not percipient witnesses to the accident or its immediate consequences. ■ As the Supreme Court reaffirmed in *Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508 [150 Cal.Rptr. 1, 585 P.2d 851], a third party plaintiff's cause of action for emotional shock must result " 'from a "direct emotional impact" on the plaintiff caused by "sensory and contemporaneous observance of the accident." ' [Citation.]" (22 Cal.3d at p. 523. Compare *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 582-585 [139 Cal.Rptr. 97, 565 P.2d 122], disapproved on other grounds in *Ochoa* v. *Superior Court, supra,* 39 Cal.3d at p. 168, and cases cited [no cause of action stated] with

*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 76 [137 Cal.Rptr. 863, 562 P.2d 1022] [cause of action stated]. See generally *Ochoa* v. *Superior Court, supra,* 39 Cal.3d at pp. 167-170 and cases cited.)

■ Rather, relying on *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518], and *Young* v. *Bank of America* (1983) 141 Cal.App.3d 108 [190 Cal.Rptr. 122], plaintiffs contend that they were "direct victims" of defendant's conduct. Here, as in *Molien,* they argue, the *Dillon* guidelines are "apposite but not controlling" (27 Cal.3d at p. 921).

In the landmark decision of *Molien* v. *Kaiser, supra,* the California Supreme Court dispensed with the "bodily injury" requirement of a cause of action for emotional distress, and recognized a new cause of action for third party plaintiffs who qualify as "direct victims" of the negligent conduct.

In *Molien,* a physician negligently examined plaintiff's wife and advised her that she had contracted syphilis. The doctor requested that Mrs. Molien advise her husband of the diagnosis and ask him to undergo similar tests. Those tests revealed that the husband did not suffer from the disease. (27 Cal.3d at p. 919.) In his complaint for the negligent infliction of emotional distress, plaintiff husband claimed that "[a]s a result of the negligently erroneous diagnosis, plaintiff's wife became upset and suspicious that he had engaged in extramarital sexual activities; tension and hostility arose between the two, 'causing a break-up of their marriage and the initiation of dissolution proceedings.'" (*Id.,* at p. 920.)

Distinguishing *Dillon,* the court held that the plaintiff was himself a direct victim of the assertedly negligent act. "[T]he risk of harm to plaintiff was reasonably foreseeable to defendants. It is easily predictable that an erroneous diagnosis of syphilis and its probable source would produce marital discord and resultant emotional distress to a married patient's spouse; Dr. Kilbridge's advice to Mrs. Molien to have her husband examined for the disease confirms that plaintiff was a foreseeable victim of the negligent diagnosis." (27 Cal.3d at p. 923.) Consequently, defendant doctor "owed plaintiff a duty to exercise due care in diagnosing the physical condition of his wife." (*Ibid.*)

In *Young* v. *Bank of America, supra,* the court held that defendant bank was liable to plaintiff for the emotional distress she suffered as a result of the bank's violation of the Credit Card Act (Civ. Code, § 1747 et seq.), which, inter alia, prohibits a credit card issuer from communicating unfavorable credit information to a third party while a billing dispute is under investigation. (141 Cal.App.3d at p. 111.) Addressing the issue of damages,

the court stated: "We believe that wilful violations of the statutory standards entitle a cardholder to compensation for all damages resulting therefrom, including damages for mental and emotional distress." (*Id.*, at p. 114.)

Seeking to establish a *Molien-Young* cause of action as a direct victim of defendant's violation of a statutory standard, plaintiffs submit that the legislative intent in enacting sections 23152 and 23153 was to deter drunk driving and to prevent the kinds of harm that drunk driving is likely to cause. As stated in *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257 [198 Cal.Rptr. 145, 673 P.2d 732]: "The drunk driver cuts a wide swath of death, pain, grief and untold physical and emotional injury across the roads of California and the nation . . . ." (*Id.*, at p. 262.) This court, plaintiffs urge, may take judicial notice that the intended beneficiaries of sections 23152 and 23153 are the people of the State of California and that the "untold emotional injury" acknowledged by the Supreme Court in *Burg, supra,* to be inflicted by the conduct of intoxicated drivers is among the kinds of harm the Vehicle Code sections were intended to prevent. Consequently, plaintiffs, as members of the protected class, stated a cause of action when they alleged that they suffered emotional distress as a proximate consequence of defendant's violation of the statutes.

We take no issue with the proposition that the harm inflicted by the drunk driver cuts a "wide swath." We join with others who have decried the terrible emotional and economic cost inflicted on our citizens by the scourge of the drunk driver. (See *Burg* v. *Municipal Court, supra,* 35 Cal.3d at pp. 261-262 and cases cited; *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 898-899 [157 Cal.Rptr. 693, 598 P.2d 854].) Drunken drivers, as our Supreme Court has recognized, "are extremely dangerous people." (*Taylor* v. *Superior Court, supra,* at p. 899.) Nevertheless, we find no support for plaintiffs' assertion that the legislative purpose in enacting sections 23152 and 23153 was to protect an intoxicated motorist's victim's next-of-kin from emotional distress.

In *People* v. *Lobaugh* (1971) 18 Cal.App.3d 75 [95 Cal.Rptr. 547], the issue was whether violation of former section 23101 (see now § 23153) results in as many offenses as there are persons injured. The court concluded not. "[A] person who has violated section 23101 whether one, or several, persons be injured thereby, has committed but one offense. Unlike the usual 'multiple victim' case, here the fundamental concern of the state is not the outrage done the victims, but rather the prevention of 'drunken driving' and the punishment of those who so conduct themselves. . . . '. . . [I]t is not the receiving of the injury that concerns the state, but the *causing* of such injuries which the state seeks to minimize.'" (*Id.*, at p. 79, italics in orig-

inal. Accord, *Wilkoff* v. *Superior Court* (1985) 38 Cal.3d 345 [211 Cal.Rptr. 742, 696 P.2d 134].)

We likewise are unaware of any authority for the proposition, implicit in plaintiffs' argument, that a tort which also comprises a statutory violation subjects the defendant to greater liability than a tort that is not also an offense.

█ As plaintiffs' correctly assert, an act in violation of statute, without justification, that proximately causes the plaintiff's injury, constitutes negligence per se. (*Michael R.* v. *Jeffrey B.* (1984) 158 Cal.App.3d 1059, 1066 [205 Cal.Rptr. 312]; see Evid. Code, § 669 [negligence presumed].) But proof of an unexcusable statutory violation does not relieve the plaintiff of the burden to show that the injury involved "resulted from an occurrence of the nature which the statute was designed to prevent and [that] plaintiff was one of the class of persons for whose protection the statute was adopted" (*Michael R.* v. *Jeffrey B.*, *supra*, 158 Cal.App.3d at p. 1066), both questions of law (*ibid.*). █ As our Supreme Court has stated: "But there is, of course, a further question in connection with the issue of negligence. Although a violation of a statute is not excusable under the particular circumstances of the case, liability is also dependent upon proof that a duty was owed to persons in the class of the plaintiff . . . ." (*Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 590 [177 P.2d 279].) Thus, in *Ledger* v. *Tippitt* (1985) 164 Cal.App.3d 625 [210 Cal.Rptr. 814], the court applied standard *Dillon* principles of foreseeability in determining the defendant's liability to a woman who witnessed the defendant stab her de facto spouse (*id.*, at pp. 644-646), notwithstanding the patently intentional and criminal nature of the defendant's act vis-à-vis his primary victim.

In essence, plaintiffs ask this court to apply to drunk driving cases rules of liability different from the principles generally applicable to the tort of negligent infliction of emotional distress. However, as stated in *Dawes* v. *Superior Court* (1980) 111 Cal.App.3d 82 [168 Cal.Rptr. 319], relating to punitive damages, "[t]here is not and there never was one rule of law for intoxicated driving cases and another rule of law for other types of cases. Cases are decided on the basis of general legal principles not the categories into which particular cases might be pigeonholed. [Citation.]" (*Id.*, at p. 90.)

█ We conclude, therefore, that notwithstanding the fact that defendant's conduct was in violation of statute, the question of his liability to plaintiffs turns on the application to this case of traditional principles of tort law.

We return, therefore, to foreseeability. "In the absence of 'overriding policy consideration . . . foreseeability of risk [is] of . . . primary importance in establishing the element of duty.' [Citations.]" (*Dillon* v. *Legg, supra,* 68 Cal.2d at p. 739.) Because plaintiffs, as indicated, do not assert a Dillon cause of action, but rely instead on their asserted status as direct victims of defendant's negligence, our analysis is limited to the question of whether defendant, pursuant to *Molien,* had a duty to plaintiffs because he could reasonably foresee that his intoxicated driving would cause them, as parents of his primary victim, emotional distress. In considering the issue we are guided by cases applying and distinguishing *Molien.*

Cases since *Molien* have established that to state a valid "direct victim" claim for negligent infliction of emotional distress, the plaintiff must state facts showing a relationship with the defendant such that the tort is to plaintiff himself.

*Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899], like *Molien* a medical malpractice case, illustrates the point. In *Andalon* the Court of Appeal permitted both parents of a child born with Down's Syndrome to recover for emotional distress resulting from the defendant physician's negligent prenatal care of the mother. The court concluded that both parents were "direct victims"—the mother as a party to the contract with the defendant doctor, and the father as "a direct beneficiary of tort-duty imposed by virtue of the doctor-patient relationship." (*Id.,* at p. 611.) The father's injury, the court stated, "is not merely derivative of Mrs. Andalon's injury but flows from his role as a participant in the reproductive life of the marital couple . . . ." (*Ibid.*)

*Kately* v. *Wilkinson* (1983) 148 Cal.App.3d 576 [195 Cal.Rptr. 902], a products liability case, likewise is illustrative. In *Kately* the plaintiff was the purchaser and operator of a defective motorboat. Upholding her claim as a direct victim of the boat's malfunction, the court stated that "[u]nder the rationale of *Molien* . . . [defendants] should reasonably have foreseen that Kately, as the purchaser and an operator of the defective boat, would suffer emotional distress when the boat malfunctioned and killed or injured another human being. . . . The user of a defective product is not a mere bystander but a primary and direct victim of the product defect; . . ." (*Id.,* at pp. 587-588.)

A *Molien* cause of action was rejected, in contrast, when the defendant's negligence was deemed to have been directed primarily at the injured or killed victim. In *Ebarb* v. *Woodbride Park Assn.* (1985) 164 Cal.App.3d 781 [210 Cal.Rptr. 751], plaintiff arrived at the scene within minutes of her brother's drowning to observe rescue workers trying unsuccessfully to re-

move his body from the spa where his arm had been lodged in an open drain. Plaintiff argued that she was a direct victim of the defendant's negligence because " 'it is reasonably foreseeable that close family members would be near the pool and that the horrifying scene after death created by the [negligence of the defendants] would cause distress different in kind than that suffered by other people after the death of a child or brother, . . .' " (*Id.*, at p. 787, italics omitted.) The court declined to "stretch the concept of duty so far as to render [plaintiff] a direct victim of the defendant's negligence in this case. . . . [¶] [T]he risk or hazard whose likelihood made the defendants' conduct unreasonably dangerous was the possibility that someone would become caught in the drain and, unable to extricate themselves, might drown. Therefore, Tommy was the only direct victim of the defendant's negligence. Inga's emotional distress is derived solely from the injury to him [citations] and, in order to recover damages for that injury, she must meet the bystander guidelines outlined by *Dillon* and its progeny." (*Id.*, at pp. 787-788 [alternative holding].)

A *Molien* cause of action was likewise rejected in the recent case of *Ochoa* v. *Superior Court, supra,* 39 Cal.3d 159. There the Supreme Court found that a mother who observed the deleterious effects on her son of the defendants' observed neglectful medical care stated a *Dillon* cause of action for emotional distress (*id.*, at p. 170), but not a *Molien* direct victim cause of action. "In *Molien*," the court stated, "defendant's misdiagnosis was, by its very nature directed at both the wife and the husband. . . . By contrast, here the defendants' negligence in the instant case was directed primarily at the decedent, with [plaintiff] looking on as a helpless bystander. . . . While she was a foreseeable plaintiff to whom the defendants owed a duty of care pursuant to . . . *Dillon,* the duty owed was owed to her as a percipient witness, not as a direct victim of negligence." (39 Cal.3d at pp. 172-173.)

If, as in *Ochoa,* a mother who directly observes her son's deterioration resulting from medical neglect which she witnesses does not qualify as a foreseeable "direct victim" of the neglect, a fortiori parents who observe their injured son's condition days after the accident cannot qualify as direct victims of the defendant's negligence. By analogy to *Ochoa* and *Ebard, supra,* we find that defendant's negligence here was directed primarily at plaintiffs' son, as a member of the motoring public, and that he was the only direct victim of defendant's drunken driving. Plaintiffs' distress was derived solely from their son's injury and in order to recover they must meet the bystander guidelines developed in *Dillon, supra.* (See *Ebarb* v. *Woodbride Park Assn., supra,* 164 Cal.App.3d at p. 788.)

"The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the

balancing of various factors, . . ." (*Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].) In *Dillon, Molien,* and *Ochoa,* the Supreme Court has balanced the applicable factors and has impliedly determined that a defendant's liability for negligent infliction of emotional distress will not extend to embrace claims arising out of the facts pleaded in this case. The trial court was bound by this determination, as are we.

We conclude, therefore, that defendant's demurrer was properly sustained.

The judgment is affirmed.

Anderson, P. J., and Poché, J., concurred.